**Roosevelt O. HICKS**

v.

**SEARS, ROEBUCK AND CO., INC.**

**Civ. A. No. 77–3472.**

United States District Court,
E. D. Pennsylvania.

Oct. 30, 1980.

Michele Kudish, Media, Pa., for plaintiff.

Robert F. Maxwell, Joseph M. Kehoe, Jr., St. Davids, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, CONCLUSIONS OF LAW, AND ORDER

GILES, District Judge.

Following a non–jury trial in the above matter and after considering the parties' post–trial briefs, the court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

1. Plaintiff is a citizen of the United States and is a member of the black race. He is a resident of Philadelphia.

2. Defendant, Sears, Roebuck and Co., is a corporation doing business within the Commonwealth of Pennsylvania, is engaged in a business affecting interstate commerce and employed more than fifteen (15) employees· for each of twenty (20) or more calendar weeks in each of the years 1975 to the present. At all times material herein defendant was an employer within the meaning of 42 U.S.C. § 2000e(b) and was subject to the provisions of 42 U.S.C. § 1981.

3. Plaintiff was employed by defendant from September 15, 1971 until January 29, 1976 at its Bridge Street Warehouse in Philadelphia, Pennsylvania as a merchandise handler. Part of his job involved the driving of a motorized vehicle, a tow motor

truck, on the warehouse floor for the purpose of moving loads of merchandise from one location to another.

4. At all times material hereto, plaintiff was a member of a collective bargaining unit represented by Teamsters Local 107, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, which union had a labor agreement with defendant covering certain terms and conditions of employment.

5. Plaintiff was discharged from employment January 29, 1976.

6. A charge of race discrimination was filed by plaintiff with the U.S. Equal Employment Opportunity Commission ("EEOC") on May 27, 1976.

7. A Notice of Right to Sue in the United States District Court was issued to the plaintiff by the EEOC on July 13, 1977, and received by plaintiff after that date.

8. The complaint in this matter was filed on October 11, 1977.

9. Plaintiff was discharged from employment on the night of January 29, 1976 for being under the influence of intoxicants during working hours. This was a summary offense punishable by immediate discharge, according to the rules of conduct incorporated into the labor agreement.

10. Prior to the discharge, plaintiff had received no written warnings pertaining to his job performance, attendance or other work related conduct.

11. During his work shift on January 29, 1976, plaintiff did exhibit erratic behavior while driving the tow motor truck (sometimes referred to as a tractor). This behavior was unusual for plaintiff and, in the estimation of his immediate supervisor was consistent with intoxication from alcohol. It prompted the supervisor to confront plaintiff about his actions.

12. However, prior to the confrontation by his immediate supervisor, at approximately 9:30 p. m., he had been observed by Robert Finley, a supervisor, in another part of the warehouse, driving the tow motor truck at a rate and in a manner unsafe to himself and pedestrian traffic. He almost collided with Finley. He yelled at Finley to stay out of the way and kept going. (N.T. 225–226). Finley later reported the incident to Clyde Beagle, Jr., plaintiff's immediate supervisor.

13. Plaintiff was late reporting back from his lunch break (N.T. 129) and could not be located by Beagle thereafter between 10:45 p. m. and 11:40 p. m. When Beagle saw him, plaintiff was driving an empty tractor. Beagle yelled at him but plaintiff did not respond to the call or to his whistle. Upon plaintiff's return ten (10) minutes later, he was observed by Beagle driving the tractor down the main aisle in a weaving fashion (N.T. 131–132). When asked where he had been, plaintiff yelled at Beagle that he could go to hell, that he worked for Sears, not for him (N.T. 38, 132).

14. When he was about three feet from plaintiff Beagle detected on plaintiff's breath what he believed to be the smell of alcohol and judged that plaintiff's speech was very slurred (N.T. 132–133). When instructed to continue to perform his duties by Beagle, plaintiff refused to take instructions. Beagle then directed plaintiff to wait because he was reporting the matter to his superior, William Conroy, the Warehouse Superintendent, who would have to handle it (N.T. 133). Beagle did not tell Conroy anymore than that plaintiff was refusing to take directions.

15. On his way to plaintiff's area, Conroy advised the Teamsters Shop Steward, Fred Utti, of the situation and asked that he accompany him, which was a normal procedure (N.T. 183–184).

16. Before Conroy could approach or speak to him about the situation, plaintiff yelled at Conroy, whom he knew, that Conroy was not his boss, and that he, plaintiff, worked for Sears (N.T. 185).

17. Without provocation, plaintiff repeated these words or words to that effect, several times. Conroy sent Utti over to talk to plaintiff to try to get him to go to work. It appeared to Conroy that Utti's repeated efforts were unavailing (N.T. 100),

so Conroy approached plaintiff to give him a direct order to go to work. When he did so, he detected a very strong odor of alcohol, noticed that plaintiff's speech was slurred, his tone of voice unusually high, and his walk erratic. Based upon these direct observations, Conroy concluded that plaintiff was under the influence of some type of alcoholic beverage and was, therefore, unfit and unable for safety reasons to drive the tractor. (N.T. 186–188).

18. At that point Conroy terminated plaintiff's employment because he had concluded plaintiff was under the influence of drugs or alcoholic beverages within the meaning of Article 12.3, the applicable provisions of the collective bargaining agreement (N.T. 190). Although Conroy had reason also to conclude plaintiff was insubordinate, he was not charged with that offense. (*Id.*). The discharge action was subject to review through grievance and arbitration machinery of the labor agreement.

19. At no time during the confrontation with either Conroy or with Beagle did plaintiff complain that he was sick or distraught or did he give any explanation for the behavior which was unusual for him (N.T. 207–208).

20. About two weeks later, at a grievance hearing, he stated that on the night of discharge he was not intoxicated from alcohol but had been taking cough syrup for fever and a cold and was upset due to the illnesses of close family members (N.T. 207–208).

21. Plaintiff admits having less than a clear recollection of the events of the night of January 29, 1978. However, he does remember being sick from a cold and was possibly staggering (N.T. 22, 41–42); being emotionally upset about a seeming sudden onslaught of family illnesses (N.T. 27–28); becoming angry when Beagle asked him where he had been; giving Beagle no explanation for his anger (N.T. 37–38); feeling that he was doing more work than a white employee driving a similar tractor and doing similar work; cursing at Beagle; telling him to go to hell; and not thinking much of the words had with Beagle (N.T. 38).

22. Plaintiff also recalls that when Utti, the shop steward came onto the scene, he was still angry and that Utti tried to calm him down but does not recall what he said either to Utti or Conroy (N.T. 61, 64–65). He believes he tried to explain to Conroy that Beagle was pressuring him but that Conroy did not give him a chance to explain the situation.

23. Utti, plaintiff's witness, testified that he tried, but was unable to restrain plaintiff in his verbiage or persuade him to return to work, that Conroy asked plaintiff for an explanation of his refusal to work, that plaintiff refused to give one but was belligerent and grossly insubordinate in his responses to Conroy and that plaintiff refused several opportunities given by Conroy to return to work. Utti testified that plaintiff pulled away from him and went toward Conroy yelling, "I'm your boss, you are not my boss", and that thereafter Conroy told plaintiff that he was fired (N.T. 96–101).

24. Utti did not form an opinion that plaintiff was intoxicated and did not recall whether his breath had the smell of alcohol (N.T. 97–98) but he did conclude that plaintiff's conduct was so insubordinate at the time that he could have been severely disciplined for insubordination (N.T. 117–121).

25. Plaintiff admits that on the night of the discharge, he did not tell anyone he was sick (N.T. 25–26) or that he had consumed five to six ounces of cough medicine, Cheracol D, and six aspirin during his shift (N.T. 23, 65–66). Plaintiff had had the medicine during his shift in his jacket pocket (N.T. 25). There is no testimony that prior to its ingestion, plaintiff measured the cough syrup with a spoon or other measuring device. He ingested possibly six ounces of the cough syrup during a period approximately five (5) hours, his first dosage being around 7 o'clock p. m. (N.T. 29).

26. The Cheracol D had a three percent (3%) alcohol content.

27. In taking the cough syrup plaintiff disregarded the instructions on the label thereon which warns that an adult dosage is

one to two teaspoonfuls every four (4) hours (Plaintiff's Exhibit–1).

28. Plaintiff denied that he had ever had a problem of drinking alcohol during the work day or appearing under the influence of intoxicants. However, a black supervisor, Preston Baldwin, who plaintiff regarded as an honest man, testified that on several prior occasions he had counseled plaintiff when he detected the smell of alcohol on his breath (N.T. 56, 210, 216).

29. Plaintiff admits he was insubordinate but denies intoxication on January 29, 1976 as well as at all other times of employment.

30. Plaintiff contends that in discharging him for intoxication, defendant treated him differently from white employees who had been accused or determined to have been intoxicated from alcohol during working hours, but who were not discharged.

31. The evidence showed that all persons, black and white, who were charged with the drinking of, or intoxication from, alcoholic beverages on the job were discharged (Defendant's Exhibit–1).

32. Those employees discharged for drinking or intoxication who admitted to being alcoholics and desired treatment, black and white, were reinstated as part of an alcoholic rehabilitation program sponsored by the company, subject to their satisfactory completion of the rehabilitation program. Those who completed the program returned to their jobs. Those who committed a second intoxication offense were discharged and not reinstated.

33. Those employees who were discharged due to suspected alcoholic intoxication but who did not admit to alcoholism were not reinstated for the purpose of participating in the rehabilitation program (N.T. 295–297).

34. A white employee, Bernard Litwinowicz, was discharged on October 27, 1975 after being suspected of drinking on the job. He was seen with a small bottle of liquor in his pocket. Although he was not actually seen drinking, his breath smelled of alcohol and his actions were unstable. He denied drinking on the job and having an alcoholic problem. The rehabilitation opportunity was not made available to him (Plaintiff's Exhibit P–12; N.T. 295, 297).

35. Defendant does not have a policy or practice whereby employees suspected of drinking on the job are required to take a medical test.

36. Plaintiff was suspected of drinking on the job under circumstances similar to those in the Litwinowicz case and was similarly discharged.

37. Like Litwinowicz, plaintiff denied any alcoholic problem and was not eligible, therefore, for any rehabilitation program. Admission to the program required the discharged employee to admit to alcoholism and the need for treatment.

38. The alcoholic rehabilitation program came into existence between 1974 and 1975. Prior to that date eight (8) employees had been summarily discharged for drinking while on shift. Seven (7) are white and one (1) is black (Defendant's Exhibit 1).

39. Joseph Lukens, white, was the first employee discharged for drinking and reinstated under the alcoholic rehabilitation program. Since its existence, twelve (12) employees have been discharged for drinking on the job or being intoxicated. Of the ten (10) qualified for the program, six (6) are white and four (4) are black (Defendant's Exhibit–1). Only Litwinowicz and plaintiff did not qualify because of their denials of any alcoholism and the need for treatment.

40. There is no evidence that the origin of the alcoholic rehabilitation was racially motivated or has resulted in disparate treatment on the basis of race.

41. Defendant's witness Conroy's testimony is credited that plaintiff's actions on the night of January 29, 1978, including his belligerency, which was out of character, his inability to walk straight and the smell of alcohol on his breath were consistent with plaintiff being intoxicated from alcohol. Further, the testimony of Finley is credited that plaintiff's driving of the tractor on the night in question was inexplica-

bly reckless. Plaintiff recalls cursing Beagle and Conroy, which was for him uncharacteristic conduct (N.T. 60, 174–175). These factors combine in favor of a finding that in affirming his original discharge decision, Conroy had a good faith belief that plaintiff's conduct was caused solely by intoxication from alcohol.

42. The discharge action was dictated under the provisions of the collective bargaining agreement, specifically, Article 12.-3. It is uncontradicted that discharge has been the uniform punishment for this offense.

43. Plaintiff's contention that his conduct and, ultimately, his discharge was motivated and explained by illegal actions of his immediate supervisor Beagle is not credited for the following reasons:

(a) Plaintiff was discharged by Conroy, not by Beagle, and there is no contention or evidence of any animus whatsoever by Conroy towards plaintiff.

(b) Prior to Conroy smelling alcohol on his breath, plaintiff had been given, through Utti, several opportunities to report to work.

(c) Plaintiff was staggering, loud, profane and abusive.

(d) Plaintiff's driving of the tractor was unusually reckless and weaving and he failed to respond to the calls and cautions of supervisors.

(e) Plaintiff's conceded gross insubordination and lack of clear recollection of events on the night in question are consistent with intoxication.

(f) Plaintiff told no one of his alleged illness or ingestion of medication on the night of discharge, although he had an opportunity to do so.

(g) Plaintiff gave no explanation for his anger.

(h) The work and work performance required of plaintiff were equal to that required of other tractor drivers (N.T. 143, 144). Two bars are required to be used on all tractors (Id.).

(i) The white employee, Eddie Armour, with whom plaintiff compared himself, was not a regular driver but a temporary fill–in (N.T. 20, 141).

(j) Plaintiff never complained at any time prior to the filing of the complaint that he had been treated differently by Beagle in his work assignments (N.T. 54–55).

(k) Plaintiff's testimony that Beagle treated Eddie Armour differently is not credited because plaintiff did not see Armour very much because he, plaintiff, was always busy with his own work (N.T. 19, 61), was never "too concerned with Eddie and Mr. Beagle" (N.T. 19) and had worked on the night shift under Beagle's supervision for only one (1) month and did not normally work the night shift (N.T. 20, 126).

(l) Plaintiff failed to make any comparison with the only other permanent tow motor operator, Connell Carr, who is white. In fact, plaintiff denied knowing him (N.T. 143).

(m) On the night of plaintiff's discharge, Connell Carr was the other permanent tow motor operator (N.T. 142).

(n) Plaintiff testified that when Beagle flagged him down, Beagle was not angry but that he was (N.T. 34).

(o) There is no evidence that Beagle ever had cause or ever threatened to discipline plaintiff (N.T. 178–179).

(p) Despite Beagle's observations of plaintiff's demeanor which could have been cause for discipline, even discharge, Beagle gave plaintiff an opportunity to go back to his job and complete his work (N.T. 31, 132, 133, 157, 175).

(q) Beagle's concern about plaintiff's whereabouts and completion of the work was reasonable and justified because freight to be trucked had been backing up on the night of January 29, 1978 from about 9:30 p. m. and this problem was known to plaintiff (N.T. 163, 164).

(r) Plaintiff's witness, Utti, testified and is credited, that there are blacks in all job classifications in the warehouse, the work atmosphere is free of racial tension, the

disciplinary system is administered equally regardless of race and Beagle treats employees under his supervision equally regardless of race (N.T. 103, 104, 105, 107).

44. There is no record evidence of white employees in the same status as plaintiff being charged with the same summary offense who received a lesser form of discipline than discharge.

45. Neither of the examples of other employees' insubordination tendered by plaintiff involved circumstances where suspicion of intoxication was also involved.

46. Plaintiff's race was not a factor in his discharge by defendant.

## II. DISCUSSION

Plaintiff brought this action pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.* alleging that he was discharged on the basis of his race on January 29, 1978. The reason given by defendant Sears for his discharge was that he was intoxicated while on the job by reason of alcohol or other drugs.

Plaintiff has the burden at all times of proving by a preponderance of the evidence the claim of race discrimination. *Kunda v. Muhlenberg College*, 621 F.2d 532, 541–43 (3d Cir. 1980). First, plaintiff must establish a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Thereafter, the burden shifts to the defendant to articulate some legitimate, non–discriminatory reason for its action. Then the burden shifts back to the plaintiff to show that the reason given was a pretext for discrimination. If the plaintiff fails to show by a preponderance of the evidence that there was a pretext, the defendant will prevail. The defendant does not have the burden of proving the absence of discriminatory motive. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 581–82, 98 S.Ct. 2943, 2952–53, 57

L.Ed.2d 957 (1978). In a disparate treatment case, as here, the plaintiff's proof must also include "as an integral part of his or her case not only the existence of disparate treatment but also that such treatment was caused by purposeful or intentional discrimination." *Presseisen v. Swarthmore College*, 442 F.Supp. 593, 599 (E.D.Pa.1977), aff'd, 582 F.2d 1275 (3d Cir. 1978) as quoted in *Smithers v. Bailar*, 629 F.2d 892 at 898 (3d Cir. 1980).

Plaintiff sought to establish a *prima facie* case by showing that he belonged to a racial minority, that he had an unblemished employment record but yet was fired, that he was treated differently, that is, not reinstated as were white employees charged with intoxication, that he was not intoxicated but was, in fact, insubordinate, that his discipline was not befitting the offense and that his supervisor who was white caused the insubordination by discriminatory work assignments.

At trial, the court reserved ruling on defendant's motion to dismiss for failure of plaintiff to make out a *prima facie* case. Having required defendant to proceed and given plaintiff the benefit of production of evidence through defendant's witnesses and documents, the court is yet constrained to find that plaintiff failed to make out a *prima facie* case. Further, even assuming plaintiff did carry that initial burden, the defendant properly shifted the burden back to plaintiff. Thereafter, plaintiff failed to show that the articulated reason was a pretext for discrimination.[1]

First, plaintiff, a non–alcoholic, failed to prove that he was treated differently from non–alcoholic white employees accused of intoxication. Instead, the proof showed that there was a white employee, Litwinowicz, who was treated in the same manner, that is, discharged and not reinstated. Both denied having any alcoholic problem as well as being intoxicated on the job. Black employees who admitted to alcoholism have been admitted into the rehabilitation program on the same basis as whites.

---

1. Defendant does not have the burden of persuasion, but rather the burden of articulation.

*Kunda v. Muhlenberg College*, 621 F.2d at 543, fn. 4.

There is no contention, and certainly, no proof, that the inception of the program derived from a racially discriminatory motive. Clearly, if one is not an alcoholic, he does not qualify, nor should be labeled as, an alcoholic. Plaintiff denied alcoholism. Contending that he was insubordinate, but not drunk, plaintiff attempted to demonstrate that other employees charged with insubordination were not discharged but disciplined through a five step warning procedure. Here, plaintiff was not charged with insubordination. Moreover, none of the instances of insubordination advanced for comparison involved circumstances where there was basis for believing the employee was intoxicated. Here, there was objective evidence consistent with the state of intoxication. By plaintiff's own admission, he was uncharacteristically abusive, used profane language, cursed at his superiors and refused direction from his immediate supervisor to perform his work. He admitted that he could not walk in a straight line, and was probably staggering at the time. Finley observed him driving the tow motor truck or tractor in an unusually reckless fashion. Beagle also observed him driving the same truck in an unusual weaving fashion after being away from his work responsibilities for an unusually long time.

Both Beagle and Conroy smelled alcohol on plaintiff's breath and observed that his speech was slurred. Utti, the shop steward, could not calm plaintiff down despite repeated efforts. Plaintiff's anger was inexplicable. He neither complained of unfair treatment in the workplace, illness or personal problems. He had been consuming, by his own admission, cough syrup during working hours in an amount which exceeded the recommended dosage on the product label. He disregarded cautions thereon not to exceed the recommended dose or to take it for fever. The cough syrup did contain three (3) percent alcohol. While plaintiff testified he carried the bottle of medicine in his pocket, he did not testify that he took

measured dosages. He does not recall precisely, how much he drank but knows only that he used a lot of it.[2]

While he asserts that Beagle treated a white employee differently, as far as work assignments are concerned, he admits he had no first hand knowledge of any disparate treatment since he neither paid attention to the work the employee did nor saw him very much (N.T. 19). Further, he compared himself to a temporary employee rather than the regular tow motor truck operator. While he guessed Beagle and "Eddie" had a strong personal relationship he failed to show how that affected him because he thought twice about it while he was working. On the night in question, "Eddie" was not even assigned to the shift. Plaintiff had been working under the supervision of Beagle only a month. He had received no discipline and was considered a good employee. He testified he did his work as instructed without the need for supervision and while he respected Beagle as his supervisor, paid him no mind.[3]

On the night he was discharged, plaintiff had no apparent cause for anger since there is no evidence he was then being required to do a disparate amount of work. Indeed, Beagle never accused him of failing to do his job. At most, Beagle asked him what had he been doing. Beagle told him to go about his job and sought to avoid a confrontation.

Plaintiff testified he had not made any prior complaints of unfair treatment and did not testify that there were any other black employees supervised by Beagle who had complained about disparate treatment. The Union shop steward testified to the absence of a working atmosphere of racial tension or racial discrimination. Plaintiff testified he did not know of any blacks in the warehouse who had been mistreated.

Plaintiff presented no evidence that there existed a company rule or practice that employees accused of drinking on the job be subjected to a medical examination. Since

**2.** (N.T. 72) He was also taking aspirin and testified he was running a fever.

**3.** N.T. 21.

he did not complain of illness of any kind, there was no cause to have him taken to the dispensary or referred to a local hospital.

■ For these reasons, the court finds that plaintiff failed to make out a *prima facie* case. Moreover, plaintiff's proof contained no evidence of purposeful or intentional discrimination.

■ Even assuming a *prima facie* case, the employer articulated a reasonable, non-discriminatory explanation for its actions. It concluded by first hand observation that plaintiff was acting as though he were intoxicated. He also smelled of alcohol. Under similar circumstances a white employee of much longer service with the company than plaintiff had been discharged without medical proof of intoxication and was not reinstated. Plaintiff, thereafter, produced no evidence showing that defendant's reason for discharge was a pretext for discriminatory treatment. Rather, the testimony of plaintiff's witness Utti, and his own, were consistent with a working atmosphere free of racial discrimination.

■ It is not necessary for the court to find, or for the defendant to prove, that plaintiff was, in fact, intoxicated on the night of January 29, 1976. It is sufficient only that there be a good faith belief of infraction of a disciplinary rule, even if it is later determined that that belief was mistaken. *Rivers v. Westinghouse Electric Corp.*, 451 F.Supp. 44, 49 (E.D.Pa.1978); *see, Turner v. Texas Instruments*, 555 F.2d 1251 (5th Cir. 1977).

For all these reasons, plaintiff has failed to meet his burden of proving that his discharge was motivated by racial discrimination.

## CONCLUSIONS OF LAW

1. Title VII, 42 U.S.C. § 2000e *et seq.*, does not preclude the discharge of an employee for reasons other than racial discrimination.

2. The burden of persuasion to prove discrimination in a Title VII case is at all times retained by the plaintiff, although the burden of production shifts once plaintiff has established a *prima facie* case.

3. In order to establish that a discharge decision violates either Title VII or 42 U.S.C. § 1981, plaintiff must establish a racial motive for the discharge.

4. Appearance and actions consistent with intoxication constituted valid reason for the discharge of an employee pursuant to the terms of the collective bargaining agreement.

5. Plaintiff has failed to meet his burden of proving that defendant discriminated against him on the basis of his race in its treatment of him during his employment or in its decision to discharge him.

6. In discharging plaintiff and in its treatment of plaintiff during his employment, defendant did not discriminate against him on the basis of race in violation of 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964.

7. In accordance with all of the above, judgment shall be entered in favor of defendant and against plaintiff.