Mary O'HARA, Plaintiff,

v.

BOARD OF EDUCATION OF the VO-CATIONAL SCHOOL IN the COUN-TY OF CAMDEN, Defendant.

Civ. A. No. 82–3267.

United States District Court,
D. New Jersey.

June 27, 1984.

Mary O'Hara, pro se.

Robert F. Blomquist, Davis, Reberkenny & Abramowitz, P.C., Cherry Hill, N.J., for defendant.

## OPINION

BROTMAN, District Judge.

This action was instituted by plaintiff Mary A. O'Hara against defendant Board of Education of the Vocational School in the County of Camden pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* alleging various acts of sex discrimination. Although the materials of record in this case constitute a paradigm of jumbled accusations by the plaintiff, the gravamen of her complaint is that the defendant school board misclassified her teaching position, and terminated her employment as a tenured teacher on the basis of her sex. Jurisdiction is conferred on this court by 42 U.S.C. § 2000e-5.

Presently before the court are three motions by the defendant: (1) for summary judgment, dismissing plaintiff's complaint, (2) for attorney's fees and costs under 42 U.S.C. § 2000e-5(k) and (3) to enjoin plaintiff from filing further complaints against the Board, its agents or its counsel regarding all aspects of O'Hara's employment relationship with the Board. For the reasons which follow, the court will grant defendant's motion for summary judgment, but deny defendant's other two motions.

## I. Factual Background

Plaintiff O'Hara was hired as a librarian by defendant in September 1973 and served in that capacity through the 1977–78 school year. She was approved for sick leave for the entire 1978–79 school year and did not return to work until December 17, 1979. Several months of the delay in returning to work were caused by plaintiff's failure to submit a physician's certificate of satisfactory recovery pursuant to N.J.S.A. 18A:16-1 *et seq.* [1]

In September 1979 defendant abolished one of its two librarian positions. The library functioned with substitutes until October 10, 1979 at which time defendant reassigned a social studies teacher, who had previously handled library duties and possessed the requisite certificate to the remaining library position.

When plaintiff returned to work in December 1979, she was assigned to a mathematics teaching position in compensatory education, a position for which she was qualified. No librarian positions were available at that time. *See generally O'Hara v. Board of Education of Vocational School in the County of Camden,* No A–1827–81T2 (App.Div. Dec. 30, 1982) at 3. Plaintiff challenged her transfer, contending that she should have received the librarian position since she had more seniority as a librarian than the incumbent. In a decision by the Superior Court, Appellate Division, the Board's action was upheld. *Id.*

On May 20, 1982 the Board suspended plaintiff and instituted administrative proceedings to terminate her tenure. Plaintiff's Complaint at p. 2, ¶ 3. On March 14 and 15, 1983 hearings were held before the Honorable August E. Thomas, an Administrative Law Judge of the New Jersey Office of Administrative Law (OAL). In an opinion filed April 26, 1984, the ALJ recounted the procedural history, noting that "the ordinary processing of this matter has been difficult." *Camden County Vocational Technical School, Camden County v. O'Hara,* OAL Dkt. No. EDU 6445–82, Agency Dkt. No. 188–5/82A, at 2. Plaintiff had hired and fired several attorneys during the course of the action and often conveyed contradictory information to the ALJ about whether she was proceeding

---

**1.** Plaintiff had challenged the Board's requirement that it must approve the physician issuing a certificate of recovery. She had supplied a certificate from a physician who did not have Board approval. Ultimately appealed to the Su-

perior Court of New Jersey, Appellate Division, the Board's determination was affirmed. O'Hara v. Board of Education of the Vocational School of Camden, No. A–578–80–T–3 (App.Div. Oct. 2, 1981).

with counsel or *pro se. See id.* at ¶¶ 10, 15, 16, 26 and 37 ff. When defendant's attorney's messenger attempted to hand deliver an order to depose Mrs. O'Hara, she "closed the door in the messenger's face, refusing to accept the order for depositions." *Id.* at ¶ 6. On the morning of March 14, 1983, the day set for the OAL hearing, O'Hara did not appear. Instead, a law clerk from the office of Beverly K. Thompson, Esq., purportedly plaintiff's attorney, telephoned the ALJ's office to inform him that plaintiff had been admitted to a hospital with "severe abdominal pain." The ALJ also issued an order, returnable March 15, 1983, for plaintiff to Show Cause why she did not appear at the tenure hearing. The order allowed plaintiff to explain her absence and her doctor's diagnosis. *Id.* at ¶ 23. On a motion by the Board, the ALJ also suspended plaintiff's salary payments as of March 7, 1983, the day she refused to accept the order for depositions. *Id.* at ¶¶ 19, 22.

On the second day of the hearing, March 15, 1983, plaintiff's son called the ALJ's office to say his mother would "not be able to make it to the hearing today." *Id.* at ¶ 24. At the hearing on March 15, defendant's attorney, Robert F. Blomquist, Esq. presented a certification signed by two messengers employed by him. The certification stated that the messengers had attempted to hand deliver to Mrs. O'Hara the motion papers which the ALJ had ordered from the bench the previous day. Mr. O'Hara answered the door, conceded Mrs. O'Hara was at home, but said she could not be disturbed. When the messengers asked Mr. O'Hara to give the papers to his wife, he told them they should "mail them." The messengers taped the papers to the front door and left the premises. *Id.* at ¶ 25.

The hearing commenced on March 15, 1983 without plaintiff's attendance. Defendant introduced documents into evidence and presented testimony from two witnesses.

David Morton, an assistant director for adult education employed by the Board and plaintiff's supervisor, testified as did Superintendent of Schools Donald Springle. *Id.* at ¶ 27.

On March 16, 1983, the ALJ notified plaintiff by letter that her tenure hearings had ended, but that prior to his disposition of the tenure charges against her, she might wish to respond to several questions. The letter concluded that plaintiff's failure to respond to the ALJ's concerns in writing by March 25, 1983, would be considered an admission of her intention to abandon her defenses to the tenure charges. *Id.* at ¶ 29. The ALJ also asked for specific information regarding her illness on March 14, 1983. *Id.* at ¶ 34.

O'Hara responded in writing on March 25, 1983 that she was suddenly taken ill on the morning of March 14, 1983. She attached her physician's report which stated that plaintiff was treated for a headache and directed to see an eye doctor. This account contradicted that given by Thompson's law clerk that plaintiff had "severe abdominal pain." *Id.* at ¶ 36.

In concluding that the plaintiff "needlessly confused and obstructed any orderly proceeding in this matter," the ALJ stated, "Assuming that [plaintiff] was legitimately ill on March 14, 1983, neither Beverly K. Thompson, Esq., nor anyone else appeared on respondent's behalf. Neither has there been any request for any adjournment made by Beverly K. Thompson, Esq. or by [plaintiff]." *Id.* at pp. 9 and 11.

The ALJ then turned to the substance of the tenure charges against plaintiff. The Board had asserted that O'Hara had "issued vile and venomous oral and written statements against the district's administrators and her fellow employees as well as against her own attorneys, the Board attorney, and the State Judiciary." Accordingly the Board argued that the endless legal actions plaintiff generated, together with the harassing actions and scandalous actions against her fellow teachers made her unfit to continue as a teacher.

David Morton, plaintiff's supervisor, testified as to the various problems that plaintiff had caused the district. For example,

plaintiff contended that the library was overcrowded and needed additional storage space. To support her contention, she asked a school pupil to stack boxes in a certain area of the library to make it appear more crowded. Plaintiff then took a photograph of the area, and sent it together with a copy of her grievance to the Commissioner of Education. This grievance, which she made public, also included a confidential memo concerning a school pupil. As Morton testified that the library conditions complained of simply did not exist, he concluded that plaintiff's behavior was irresponsible and vindictive. *Id.* at 12.

Morton also testified that O'Hara refused to turn in the year-end grades for her pupils, objected to receiving an assignment by another teacher and objected to having to take inventory, which she considered a technician's job. Accordingly, he concluded that her continued insubordination rendered her unreliable and uncooperative and had a negative impact on the school. *Id.* at 12–13.

Superintendent Springle testified that plaintiff had filed over twenty litigation actions against the Board and all of them had been unsuccessful. They had cost the Board more than $20,000 to defend and the Superintendent believed that plaintiff "was taking this shotgun approach with the hope that someday a pellet might hit." *Id.* at 16–17. Plaintiff had filed charges against the Superintendent that he was "fomenting fear tactics and committing white collar crime" and that he had offered perjured testimony at numerous hearings. Plaintiff also accused other school employees, the Board solicitor and other state employees of white collar crimes. *Id.* at 13–14.

The Superintendent testified that an example of the plaintiff's behavior that caused the Board to bring tenure charges against her was a document in which she referred to herself as a "hostage Title I math teacher." Plaintiff repeatedly called herself a "hostage" when responding to any administrative memo, and this reference corresponded in time with the Iranian hostage crisis. In attempting to portray

herself as similarly situated as the American hostages in Iran, she accused the Board of engaging in unlawful terroristic activities. *Id.* at 14.

As an example of the impact of plaintiff's behavior on the other staff members, Springle testified that an older teacher, a Mrs. W., informed him that she had elected early retirement because of plaintiff's behavior. When plaintiff was assigned as a team teacher with Mrs. W., she

> walked to the front of the classroom one day, in front of a roomful of pupils, and drew a chalk line down the middle of the chalkboard to the floor, completely through the center of the floor to the rear of the room and up the rear wall and stated, "Mrs. W., this is your side of the room and this is my side. You stay over there and I'll stay over here." Mrs. W. left the district in the middle of the school year. *Id.* at 15–16.

Based on the procedural history of this matter and the evidence, only a fraction of which this court has recounted, the ALJ concluded that (1) the plaintiff was given a full opportunity to defend herself against the Board's charges, (2) the plaintiff had abandoned her defenses to the charges by manipulating her absence from the hearing on March 15, 1983, (3) the plaintiff's actions were "bizarre, ludicrous and contributed to a substantial disruption in the administration of the school district" and (4) the charges were true in fact and warranted plaintiff's dismissal. Accordingly, he concluded that plaintiff's tenure from the Board ended on March 7, 1983. *Id.* at 17.

The ALJ's opinion was filed with the Commissioner of Education who, on June 22, 1983, affirmed the ALJ's determination and ordered that O'Hara be dismissed from her tenured position with the Board. In the Commissioner's opinion, he explained that plaintiff hired a fourth attorney to appeal the ALJ's decision. Although this attorney filed exceptions to the ALJ's decision, plaintiff filed her own exceptions and then repudiated those of her attorney. *In the Matter of the Tenure Hearing of Mary Alice O'Hara, School District of the Cam-*

*den County Vocational Technical School, Camden County,* OAL Dkt. No. 1 EDU 6445–82 at 2. In particular, the Commissioner stated he "cannot agree that the judge conducted himself in an improper manner as alleged by [O'Hara] because of her claim that he unduly favored the Board. Nothing in the record sustains such allegation. In fact, a thorough examination of the record reveals to the Commissioner that the judge showed significant restraint in his conduct of the case." *Id.* at 6.

In discussing plaintiff's failure to appear at the hearing before the ALJ, the Commissioner cited numerous other cases where this had occurred and concluded that "the judge properly refused to grant a continuance of the March 1983 tenure hearing. [O'Hara's] obvious displeasure at this ruling does not obviate the fact that she has received full measure of due process. The Commissioner so holds." *Id.* at 8.

On February 1, 1984, the Commissioner's decision was affirmed by the State Board of Education.

Having reviewed the tenure proceedings against plaintiff, the court now turns to the instant action, a Title VII action filed on September 30, 1982 against the Board for sex discrimination in her classification and discharge. Since the court holds that the findings of the ALJ, as affirmed by the Commissioner of Education, should be given collateral estoppel effect, the court will dismiss plaintiff's Complaint as she is unable to prove that she is qualified for the teaching position and therefore unable to prove a *prima facie* case of discrimination.

## II. The Preclusive Effect of the State Administrative Determination

■ A federal court may give collateral estoppel effect to a state administrative agency determination if two requirements are met. First, the administrative agency must have acted in a judicial capacity and resolved disputed issues of fact properly before it which the parties had an adequate opportunity to litigate. *United States v. Utah Construction Co.,* 384 U.S. 394, 422,

86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966); *Borough of Ellwood City, Pa. v. Pennsylvania Power Co.,* 570 F.Supp. 553, 558–59 (W.D.Pa.1983). Second, the federal court will determine whether the state court itself would hold the state administrative proceeding should be given preclusive effect. This requirement is mandated by the Full Faith and Credit Statute, 28 U.S.C. § 1738. *Local 1006, A.F.S.C.M.E., AFL–CIO v. Wurf,* 558 F.Supp. 230, 242 (N.D.Ill. 1982); *see generally Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980).

### A. Preclusion under Utah Construction

■ In the present case the ALJ was acting in a judicial capacity when he found that O'Hara's tenure should be terminated. He had a full hearing and provided an opportunity for both parties to appear and be represented by counsel, to present evidence and to call, examine and cross-examine witnesses. These procedures clearly meet the basic prerequisites for the application of collateral estoppel. *Utah Construction, supra; Moore v. Bonner,* 526 F.Supp. 143, 147 (D.S.C.1981).

Two arguments might be raised for denying the administrative decision preclusive effect. First, plaintiff might argue that she never appeared at the administrative hearing and therefore this decision was made without affording her an opportunity to present her case. This argument is entirely without merit. The important due process criterion is the *opportunity* to present one's evidence, and it is irrelevant that the party declined to take advantage of that opportunity. *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 480–81, 102 S.Ct. 1883, 1896–97, 72 L.Ed.2d 262 (1982); *Allen, supra,* 449 U.S. at 95, 101 S.Ct. at 415 ("collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a "full and fair *opportunity*' to litigate that issue in the earlier case.") (emphasis added); *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210

(1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971). If a party who was granted the opportunity to participate in a hearing and refused to do so without a legitimate reason could then argue that the judgment could not be given preclusive effect, that party would undermine the entire foundation of collateral estoppel. A party would be rewarded for acting in bad faith and hindering the fair and efficient consideration of cases.

In the present action, the ALJ provided O'Hara with the full opportunity to present her position. When she did not appear at the hearing on the morning of March 14, 1983, the ALJ postponed the hearing for one day and allowed her the opportunity to explain her absence. In his opinion, the ALJ found as a fact that O'Hara never adequately explained her absence and that she presented contradictory accounts of her purported medical problems—severe abdominal pain in one report and a headache in another. On appeal, the Commissioner of Education found that the ALJ properly refused to grant a continuance of the March 1983 hearing. This court also concludes that this determination of the ALJ is fully supported by the record and accordingly finds that plaintiff O'Hara was given a full and fair opportunity to litigate the issues at the administrative hearing.

■ A second argument which could be raised for denying preclusive effect to the administrative determination is that the matter is presently on appeal before the Superior Court, Appellate Division. This argument must be rejected for two reasons.

First, an analogy may be drawn to the collateral estoppel effect of federal court judgments. "Under well-settled federal law, the pendency of an appeal does not diminish the *res judicata* effect of a judgment rendered by a federal court." *Hunt v. Liberty Lobby, Inc.*, 707 F.2d 1493,

1497–98 (D.C.Cir.1983) (citations omitted). *See also* 1B J. Moore, Moore's Federal Practice ¶ 0.416[3] at 521 (2d ed. 1983) ("The federal rule is that the pendency of an appeal does not suspend the operation of an otherwise final judgment as res judicata or collateral estoppel.")

Second, New Jersey courts have never required that an administrative determination be subject to court review for it to be given preclusive effect. *Russell v. Tenafly Board of Adjustment*, 31 N.J. 58, 65, 155 A.2d 83 (1959); *City of Hackensack v. Winner*, 82 N.J. 1, 410 A.2d 1146 (1980).[2] In the present case, moreover, plaintiff has availed herself of appeals from the ALJ's decision to the Commissioner of Education and then to the State Board of Education, both of which have affirmed the ALJ's findings.

■ Accordingly, the court finds that the judgment of the ALJ is entitled to preclusive effect under the federal standard enunciated in *Utah Construction*.

**B. Preclusive Effect of the ALJ's Judgment in the New Jersey Courts**

■ Under New Jersey law, the doctrine of collateral estoppel precludes relitigation of questions "distinctly put in issue" and "directly determined" adversely to the party against which the estoppel is asserted. *New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Education*, 654 F.2d 868, 876 (3rd Cir.1981). New Jersey courts accord res judicata and collateral estoppel effect to decisions of administrative tribunals. *Id.* at 876, n. 12, citing *Winner, supra.* Res judicata would apply to an agency's determination where the proceedings are formal and adversary and when the agency is engaged in factfinding, rather than policymaking. *Russell, supra,* 31 N.J. at 65, 155 A.2d 83.

■ Turning to the present action, the court finds that New Jersey courts would

---

**2.** Most state courts, including those of New Jersey, have apparently not addressed the issue of the collateral estoppel effect of state court judgments pending appeal. Moore's Federal Practice, *supra* at 520.

give preclusive effect to the judgment of the ALJ terminating plaintiff's tenure. The ALJ is part of the Office of Administrative Law (OAL) which was established by L.1978 c. 67, N.J.S.A. 52:14F–1 et seq. and

> constitute[d] the culmination of years of effort to achieve fundamental reforms affecting the administrative agencies of state government. The signal improvement encompassed by the new program [was] the establishment of a corps of independent hearing officers, referred to as "administrative law judges," directly responsible to the Director of the Office of Administrative Law.

Unemployed-Employed Council of New Jersey, Inc. v. Horn, 85 N.J. 646, 649, 428 A.2d 1305 (1981). The purpose of this legislation was to bring impartiality and objectivity to agency hearings, as ALJ's would no longer be employees of the agency, with a perceived institutional bias or propensity in favor of the agency, but would be independent judges. Id. at 650, 428 A.2d 1305.

In the present case, the ALJ was a judge from the OAL. Pursuant to N.J.S.A. 52:14B–10(a), an ALJ in a contested case must allow each party to "present his case or defense by oral and documentary evidence, submit rebuttal evidence and conduct such cross-examination as may be required, in the discretion of the administrative law judge, for a full and true disclosure of the facts." The ALJ in this case granted plaintiff the opportunity to exercise all these procedural rights at a full hearing.

As the hearing was formal and adversary, and the ALJ engaged in factfinding and adjudication, as opposed to policymaking, Russell, supra, 31 N.J. at 65, 155 A.2d 83, and the qualification of plaintiff to continue as a tenured teacher was "distinctly put in issue" and "directly determined," New Jersey courts would accord collateral estoppel effect to its findings. In the recent case of Trautwein v. Board of Education of the Borough of Bound Brook, Civ.No. 83–688, slip op. at 10 (D.N.J. April 9, 1984), Judge Ackerman likewise found

that the Commissioner of Education's decision, upholding an ALJ's fact-finding, would be given collateral estoppel effect by New Jersey courts. Furthermore, there can be no doubt that the OAL's procedures meet the requirements of the Fourteenth Amendment's Due Process Clause. Compare Wood v. Garden State Paper Co., Inc., 577 F.Supp. 632 (D.N.J.1983) (the procedures of New Jersey's Division of Civil Rights violated due process). The OAL's procedures allowed plaintiff to present witnesses and exhibits, to rebut evidence submitted by the defendant, and to issue subpoenas, all procedures deemed important by the Supreme Court to an evaluation of the constitutionality of the preclusive effect of an agency's determination. Kremer, 456 U.S. at 483–84, 102 S.Ct. at 1898–99.

### III. Application of the ALJ's Findings to this Title VII Case

As the court has determined it is appropriate to apply the finding of the ALJ that plaintiff's tenure should be terminated, the court now turns to its applicability in the context of a Title VII case. The familiar allocation of burdens and order of presentation of proofs in cases involving alleged discriminatory treatment was set forth by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

First, the plaintiff must prove a prima facie case of discrimination by a preponderance of the evidence.

Second, a successful presentation of the prima facie case shifts the burden to the defendant to articulate some legitimate, non-discriminatory reason for the disputed action.

Third, if the defendant carries this burden, the plaintiff must show by a preponderance of the evidence that the proffered reasons are but a pretext for discrimination. Id. at 802–03, 93 S.Ct. at 1824.

This analytic framework was devised in a discriminatory "failure-to-hire" context, but it has also been applied in discriminatory promotion and termination cases. See, e.g., Burdine v. Texas Dep't. of Community Affairs, 647 F.2d 513, 514 n. 2 (5th Cir.

1981) (on remand from the Supreme Court); *Hicks v. Sears, Roebuck & Co., Inc.,* 503 F.Supp. 930 (E.D.Pa.1980); *Perham v. Ladd,* 436 F.Supp. 1101, 1104–05 (N.D.Ill. 1977) (sex discrimination in denial of tenure).

**[9, 10]** In order for a plaintiff to make out a *prima facie* case of discrimination, she must show that she was qualified for the particular job, but that she was terminated under circumstances that give rise to an inference of unlawful discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253 and 254 n. 6, 101 S.Ct. 1089, 1093 and 1094 n. 6, 67 L.Ed.2d 207 (1981). The reason that a plaintiff must make out a *prima facie* case is to show the termination from the job did not result from the two most common legitimate reasons on which an employer might rely for terminating an employee: an absolute or relative lack of qualifications or the reduction in number of positions available. *See Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977). In *Williams v. Boorstin,* 663 F.2d 109 (D.C.Cir.1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2319, 68 L.Ed.2d 842 (1981) the Circuit Court of Appeals for the District of Columbia found that the issue of an employee's qualification is relevant at each stage of the *McDonnell-Douglas* analysis. *Id.* at 116 n. 41. In finding that an employee's qualification "would seem to be almost indispensable to a Title VII violation," *id.* at 116, and "is the pivotal component of the *McDonnell-Douglas prima facie* case," *id.* at 118, the court stated:

> No good reason exists for allowing a nonqualified employee to invoke Title VII to cure deficiencies in his or her qualifications, or to immunize potentially serious defects in the worker's job profile. It would be incongruous—and certainly not required by law—to give an employee ... a stranglehold on a job irrespective of that employee's material, work-related flaws.

*Id.* at 116–17.

■ In the present case, the ALJ found that O'Hara's actions in her job were "bizarre, ludicrous and contributed to a substantial disruption in the administration of the district" and warranted her dismissal. Opin. at 17. As the Commissioner of Education affirmed the ALJ and found that plaintiff's tenure should be terminated, this finding conclusively means that plaintiff does not deserve her employment position and is not qualified to be promoted (reclassified) or continue in that position. This is especially true since as a practical matter, it is rare and difficult indeed to terminate a teacher's tenure. As the court concludes that plaintiff O'Hara is not qualified to continue teaching, she has failed to make out a *prima facie* case of sex discrimination. The court will grant defendant's motion for summary judgment, dismissing plaintiff's Complaint.

## IV. Attorney's Fees and Costs

■ Defendant moves for an award of attorney's fees and costs under 42 U.S.C. § 2000e–5(k) as the prevailing defendant in a Title VII case if it finds "the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Christianburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). For the reasons which follow, the court will deny defendant's motion.

In *Perichak v. Int'l Union of Electrical Radio and Machine Workers, Local 601, AFL–CIO,* 715 F.2d 78, 80 (3rd Cir.1983), the Third Circuit said that "[i]n almost all situations ... the district court's 'bad faith' finding will be predicated upon the record developed at the merits hearing, for it is normally at that proceeding that the *bona fides* of the plaintiff's claims are disclosed." As this court has granted summary judgment in this action before the trial, the court has not been in a position to evaluate the merits of plaintiff's claim of sex discrimination at a merits hearing. Therefore, the court believes it would be inappropriate to find that plaintiff did not have a colorable claim, *Nemeroff v. Abel-*

*son,* 704 F.2d 652, 660 (2nd Cir.1983), or that she filed her claim in bad faith or litigated it for vexatious reasons. Moreover, it would not serve the interests of judicial economy or the interests of the parties to prolong this action merely to determine the *bona fides* of plaintiff's complaint for the purpose of evaluating defendant's request for attorney's fees.

First, discovery is still continuing, numerous motions remain outstanding, including motions to quash subpoenas and file an amended Complaint, and the plaintiff has yet to file an expert's report.

Second, the court has awarded counsel fees during the course of this litigation when it has deemed it appropriate so that defendant has been compensated for particularly egregious violations by plaintiff. *See* Opinion and Orders of Magistrate Simandle entered March 20, 1984 and April 10, 1984, awarding counsel fees, expenses and costs to defendant; affirmed by this court by an Opinion and Order entered April 27, 1984.

Third, although plaintiff has filed numerous legal actions in the past, the court is not aware that any of them concerned a charge of sex discrimination.

The court will also deny the motion for an award of costs under Fed.R.Civ.P. 54(d), as per its usual practice.[3]

### V. Enjoining Plaintiff from Filing New Suits

■ Defendant also moves to enjoin plaintiff from filing "any further legal actions in any other forum (state or federal) against the Board, its agents, or its counsel involving matters stemming from her past employment with the Board or litigation involving that employment." Defendant's Brief at 18. In support of this motion, defendant cites *D'Amore v. D'Amore,* 186 N.J.Super. 525, 453 A.2d 251 (App.Div. 1982). In that case, the Superior Court, Appellate Division held that "it is only prospective litigation of specifically identified

claims which is susceptible to restraint, and then only after those claims have been determined to fall within one of the recognized categories of objective harassment." *Id.* at 530, 453 A.2d 251.

The public has a fundamental right of access to the courts. Any injunction limiting that access must be exercised sparingly and only in those situations in which "the exclusive harassment purpose is not merely a matter of the suitor's subjective intent but is, rather, objectively determinable." *Id.* The court finds that an injunction precluding any litigation regarding plaintiff's past employment is overly broad and will be denied. There are innumerable issues that could arise concerning plaintiff's past employment and such a far-ranging prospective injunction would be inappropriate.

The court believes that defendant will have an adequate remedy should plaintiff institute further litigation. If plaintiff attempts to relitigate precluded matters regarding her past employment, defendant can move for summary judgment, and an award of counsel fees. If plaintiff attempts to raise new matters regarding her past employment, defendant always may move for an award of counsel fees if a suit was commenced or prosecuted in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973).

### VI. Conclusion

For the reasons stated above, the court will: (1) grant defendant's motion for summary judgment, dismissing plaintiff's Complaint, (2) deny defendant's motion for an award of attorney's fees and costs, and (3) deny defendant's motion for a prospective injunction against future litigation by plaintiff.

---

**3.** In *Coyne-Delany Co., Inc. v. Capital Development Board of the State of Illinois,* 717 F.2d 385, 390 (7th Cir.1983), the Seventh Circuit stated that in the context of a civil rights suit under 42 U.S.C. § 1983, a court must deny both costs and attorney's fees if the suit was not brought in bad faith and was not frivolous. The same standard may well apply to suits under Title VII.