356 F.Supp.2d 984 (2005)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, and
Mohammed Shanif Hussein, Intervenor Plaintiff,
v.
TRANS STATES AIRLINES, INC., and Airline Pilots Association, International (AFL-CIO), Defendants.
No. 4:03 CV 0964TCM.
United States District Court, E.D. Missouri, Eastern Division.
February 9, 2005.
*985 Gregory A. Rich, Jerome J. Dobson, Jonathan C. Berns, Michelle Dye Neumann, Weinhaus, Dobson, Goldberg & Moreland, St. Louis, MO, for Hussein.
James L. Lee, Deputy General Counsel, Gwendolyn Young Reams, Associate General Counsel, U.S. Equal Employment Opportunity Commission, Washington, D.C., C. Felix Miller, Jr., Senior Trial Attorney, Robert G. Johnson, Regional Attorney, Equal Employment Opportunity Commission, St. Louis, MO, for EEOC.
James N. Foster, Jr., William B. Jones, McMahon Berger, Captain David J.A. Hayes, III, Vice President General Counsel, Trans States Airlines, Inc., St. Louis, MO, for Trans States.

MEMORANDUM AND ORDER
MUMMERT, United States Magistrate Judge.
This employment discrimination action is before the Court[1] on the motion of *986 defendant Trans States Airlines, Inc. ("TSA") requesting summary judgment on the claims of the Equal Employment Opportunity Commission ("EEOC") and Mohammed Shanif Hussein ("Hussein") that he was discharged by TSA because of his race, religion, and national origin in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000(e) to 2000e(17).[2] [Doc. 85]

Background
Mohammed Shanif Hussein was born in 1974 in Sigatoka, Fiji. (Hussein Dep. at 8.) His great-grandparents were born and raised in India; his grandparents were born and raised in Fiji. (Id. at 150.) His race is Indian; his national origin is Pacific Islander. (Id. at 43.) He lived in Fiji until 1990 when his family moved to New Zealand. (Id.) In 1997, he joined his family in the United States. (Id. at 11-12.) He completed his education in aviation in the United States. (Id.) His religion is Islam, and he considers himself a Muslim. (Id. at 43.)
TSA is a regional commercial airline which operates pursuant to agreements with American Airlines, United Airlines, and U.S. Airways. (Def.Stip. ¶ 1.)[3] At all times relevant, TSA had an employee handbook ("handbook"). (Id. ¶ 2; Pl.Ex. 2.) In 1994, TSA and the Air Line Pilots Association ("ALPA"),[4] the exclusive bargaining representative of the TSA pilots, entered into a collective bargaining agreement ("CBA") outlining the terms and conditions of employment for TSA pilots. (Def. Stip. ¶¶ 3 and 4; Pl.Ex. 1.) Additionally, TSA's General Operation Manuel ("GOM") sets forth standards for pilot conduct. (Pl.Add.Stip. ¶ 21.) If there is a conflict between the handbook and the CBA, the CBA controls. (Daniel Reed Dep. at 10; Reed Aff. ¶ 8; Dario Miranda[5] Aff. ¶ 10.) If there is conflict between the handbook and the GOM, the GOM controls. (PL Stip. ¶ 23; PL Intervenor Aff. ¶ 5.) TSA pilots are tested on the content of the GOM, are to carry it with them at all times when on duty, and are to be guided in their conduct by it. (Miranda Dep. at 36-38.)
Newly hired TSA pilots serve a probationary period for one year. (CBA § 22F.) The CBA provides, in relevant part:
B. Discipline and Discharge
1. Notice of Disciplinary Action
a. A pilot shall not be discharged, suspended, or otherwise disciplined without just cause. A pilot will normally be notified, orally or in writing, when the Company's investigation determines that discipline may be warranted, and the pilot will be given a reasonable opportunity to present information on his behalf.
b. In those instances when the Company discharges, suspends, or otherwise disciplines a pilot, the Company shall issue the pilot written notice thereof no later than two (2) working days following the date on which the discipline is imposed. Such written notice shall contain a short, concise statement of the facts on which the discipline is based and the action taken, and *987 shall be signed by the Chief Pilot or his designee. The Association shall also be provided with a copy of the notice.
. . .
5. Nothing in this agreement shall be construed as extending the rights of Paragraph B of this Section to a pilot during his probationary period.
(CBA §§ 20B(1)(a) and (b), B(5).) While on probation, however, a pilot is not entitled to file a grievance over any discipline issue, including discharge. (Def.Stip. ¶ 9.) Additionally, pursuant to the CBA, TSA need not (a) have just cause to terminate a probationary pilot, (b) conduct an investigation, (c) provide the probationary pilot notice of discipline or reason for the discipline, or (d) provide a probationary pilot with an opportunity to present information on his or her own behalf. (Id. ¶ 10.)
"Fair, equal and respectful treatment of all employees" is a TSA policy, according to the handbook. (Pl.Ex. 2 at 6.) The handbook also provides that "[a]ll employees are expected to service the Company with judgement, discretion and integrity in performing their duties. Relations of a compromising nature, or even the appearance of such relations, must be scrupulously avoided." (Id. at 7.) TSA assures its employees "that we will discuss any problem, answer any questions, and address any issue that you bring to our attention." (Id. at 8.) TSA also commits to giving the "utmost consideration to the well being of its employees. We intend that every employee shall be treated justly and considerately at all times." (Id. at 9.) Moreover, TSA policy is "to afford equal opportunity for employment to individuals regardless of race, color, religious creed, sex, age, national origin, handicap or veteran status." (Id. at 10.) TSA's discipline policy is described in the handbook as follows:
It is the policy of Trans States Airlines, Inc., to treat all employees as fairly as possible, given the exact circumstances of each individual situation. A system of progressive discipline will be utilized with employees who fail to observe/follow company procedures, rules, or meet work performance requirements. Except for serious violations, an employee is to be first given a supervisor's verbal warning for an infraction. Subsequent steps will include a supervisor's written warning, time off without pay, and discharge. Certain serious infractions may necessitate a consolidation of one or more of the progressive steps. The basic Rules of Conduct, as outlined in the employee handbook, summarize those rules that may warrant immediate grounds for dismissal.
Supervisors are expected to exercise good judgment in administering discipline to an employee, with the understanding that the purpose of discipline is to be corrective in nature.
(Id. at 14.) The Rules of Conduct outlined in the handbook specify several types of behavior that may warrant immediate dismissal, including inappropriate treatment of customers; excessive absenteeism or tardiness; dishonesty, e.g., theft or vandalism; certain types of personal behavior, e.g., harassment of other employees, fighting; and use of drugs and alcohol. (Id. at 19-21.)
Additionally, the GOM provides that:
B. Drinking alcohol beverages (including beer and wine) is prohibited for crewmembers as follows:
. . .
4. While wearing or displaying the Trans States Airlines pilot uniform and/or insignia or portions thereof that identifies Trans States Airlines and its crewmembers as such.

*988 5. To eliminate the possibility of any Trans States Airlines crewmember employee in uniform being associated with the use of alcoholic beverages, crewmembers in complete or partial uniform as described above, are prohibited from visiting any establishment or portion thereof the primary purpose of which is to serve alcoholic beverages.
(Pl.Ex. 3, GOM Part 10 B(5).)
To be considered "in uniform" under the Rules of Conduct, a pilot must wear any single, or multiple, piece of the uniform which identifies the pilot as a member of a flight crew. (Def.Stip. ¶ 18.) These uniform pieces include epaulets on the pilot's shirt, pilot's hat, a TSA identification badge, pilot's jacket, and/or wings. (Id.) If a pilot is wearing one of these pieces, he or she is considered to be "in uniform." (Id.)
Hussein applied for employment with TSA on February 8, 2001. (Def. Exs. C and C-1.) On the page of the application requesting a ten-year employment and school history, he only listed two schools. (Def.Ex. C.) One he had attended from 1991 to 1992 and the other from 1993 to 1997. (Id.) On a Pilot Applicant Supplemental Information Sheet requesting the same ten-year history, he listed other entities. (Def.Ex. C-1.) One, Sierra Academy, he had attended as a student and had also been employed by as a flight instructor from April 2000 to the then-present. (Id.) Another was an employer, United Express/SkyWest ("SkyWest"), that he had worked for from December 1997 to October 1999 as a customer service supervisor. (Id.) He left that job when he was hired as a flight instructor by Sierra Academy. (Id.) This employment information was apparently verified by TSA on February 21. (Id.)
Hussein was hired on February 26 by TSA's Director of Training, Richard Burton, with the approval on March 6 of Captain [6] Daniel Reed, TSA's vice-president in charge of flight operations. (Def.Stip. ¶¶ 21, 22.) Reed reviewed Hussein's new hire paperwork which identified Hussein by his full name, Mohammed Shanif Hussein. (Id.; Def. Ex. D.) On June 8, he approved Hussein's transfer from Richmond, Virginia, to St. Louis, Missouri. (Def. Ex. E; Def. Stip. ¶ 23.) He also approved a pay raise for Hussein on June 18 and another one on August 1. (Def. Stip. ¶¶ 24, 25; Def. Ex. AAA.)
On September 11, 2001, terrorists highjacked four passenger airlines and used the airliners to attack the twin towers of the World Trade Center in New York City and the Pentagon in Arlington, Virginia. One of the airliners crashed in rural Pennsylvania, apparently destined for the United States Capitol. The Court takes judicial notice that air travel in the United States was eliminated for several days following the attacks and that the airline industry has since drastically changed because of these attacks. TSA was "shutdown" for several days following the 9/11 attacks. (Swoboda Dep. at 22-23; Aman Dep. at 65.)
Two days later, on the evening of September 13, Hussein was staying at the Howard Johnson St. Louis Airport, Hotel. (Def.Stip. ¶ 28.) Skooner's is a restaurant and bar located in the hotel, with a dining area six to seven times larger than the bar area. (Id. ¶ 29; PI. Stip. ¶¶ 61-62.) The bar area is only five to seven percent of the entire footprint of Skooner's. (Otte Aff. ¶ 3.) The bar area includes stools *989 along the bar and a floor space occupied by the bar and stools. (Id.) There are 12 or 13 stools at the bar. (Id.)
Emmett S. Conrecode was staying at the same hotel that evening, having been stranded in St. Louis between flights as a result of the September 11 attacks. (Conrecode Dep. at 11.) He was then a pilot for Trans World Airlines ("TWA") and had recently retired as a major in the reserves of the United States Marine Corp. (Id. at 7-9, 76, 114.) Conrecode testified in his deposition that in the evening of September 13 he had seen Hussein walk into the bar area of Skooner's holding and drinking a beer and wearing a pilot's uniform, specifically a pilot's shirt,[7] dark pants, and epaulets with no tie or jacket. (Id. at 17-18.)[8] Conrecode further testified that he noted Hussein's presence because it is against federal regulations and, therefore, airline company policy to wear a pilot's uniform while in a drinking establishment. (Id. at 19.) Hussein was also, Conrecode believes, wearing his TSA identification badge when Conrecode first saw him. (Id. at 41.) At one point, Hussein left the bar area. Another pilot told Conrecode that he (the other pilot) had advised Hussein to leave the bar while in his pilot's uniform. (Id. at 27-28.) Hussein came into the bar a second time without his epaulets. (Id. at 31, 32, 37.)
Conrecode further testified that Hussein's mood was celebratory; he appeared "ecstatic" over the events of 9/11. (Id. at 27, 29, 35-36, 50-51.) The bartender told Conrecode that Hussein had been debating with other bar patrons in favor of the 9/11 attacks. (Id.) Conrecode went to the hotel front desk and asked the name of the "pilot walking around . . . with the beer"; he was given Hussein's name and the information that he was a pilot with TSA. (Id. at 42-43.) That same evening, Conrecode called the Federal Bureau of Investigation ("FBI") and left a message that he had seen someone drinking while in a pilot's uniform and "ecstatic" about 9/11. (Id. at 56-57.) Conrecode also called the airport police, described Hussein in uniform in a bar reporting that he would be flying the next day, and related that he had heard "secondhand" that Hussein supported the 9/11 attacks. (Id. at 58, 64, 65.) The next morning, an FBI agent interviewed Conrecode at his hotel. (Id. at 70.) Conrecode may have advised the FBI that Hussein was of Middle Eastern descent. (Id. at 89.) That day, September 14, or the following day, Conrecode contacted TSA and requested the telephone number of the manager on duty in order to report Hussein's behavior at the bar. (Id. at 95.) He identified himself as an airline captain with TWA, but was not sure if he gave his name. (Id. at 86, 97-98.) He believes that he advised the manager on duty that Hussein was drinking in a bar in uniform, was intimidating stranded passengers with his behavior, and was making positive comments about the 9/11 attacks. (Id. at 97-106.) He is not certain whether he also advised the manager on duty that Hussein was wearing an identification badge, but he did recall telling the manager that the pilot in question was Hussein. (Id. at 108-09.) He spoke with Reed over the telephone, disturbing him in a meeting and being put on hold until Reed could excuse *990 himself from the meeting and hear Conrecode's story. (Id. at 86.) It was Conrecode's "greatest fear" that Hussein was going to fly a plane into a building. (Id. at 132.)
As noted above, Daniel Reed is TSA's vice president of flight operation in charge of flight operations and pilots. (Reed Dep. at 6 and 8.) While in a meeting after September 11, he received a telephone call on his cellular telephone during which the caller told him that Hussein had been seen in the lower bar at a Howard Johnson Hotel in a pilot's uniform making comments about the 9/11 attacks. (Id. at 16, 21, 23-24, 30, 32.) The caller did not identify himself.[9] (Id. at 16.) According to Reed, the caller stated that he had read Hussein's name from TSA's identification badge. (Id. at 26, 32, 62.) The caller identified Hussein by name, but did not state that he had been drinking. (Id. at 28, 29.) Reed asked his subordinates to verify the fact that Hussein was in St. Louis and not on a day-trip. (Id. at 27, 37, 38, 57.) It was reported within an hour that Hussein was in St. Louis and was a probationary pilot. (Id. at 27, 38, 57.) Reed then made the decision to fire Hussein and instructed one of the managers at the meeting to terminate Hussein the following day. (Id. at 11, 38, 62-63, 133.) Consequently, Hussein's employment was terminated the following day. (Id. at 133, 137, 138.) The anonymous caller further advised Reed that another TWA pilot had seen Hussein leave the bar after the bartender requested that he leave, and that Hussein "took off his uniform pieces" and entered another bar in the hotel. (Id. at 29, 30, 35.) The anonymous caller also informed Reed that he would call Reed again, but that second telephone call did not occur. (Id. at 20, 25.) Reed testified that the events of September 11 combined with Hussein's name did not raise any concerns. (Id. at 41.) Reed also testified that he did not know Hussein's religion after hearing Hussein's name.[10] (Id. at 70.)
Captain Michael D. Swoboda was a TSA flight manager in September 2001, supervising approximately 700 employees, including Hussein. (Swoboda Dep. at 9, 11, 50-51.) He "possibly" could have met Hussein during the interview and hiring process. (Id. at 11-12.) He did not know Hussein's religion, nor does he know which of the TSA pilots are of the Islamic faith. (Id. at 13-14.) TSA pilots are not permitted to be in uniform in an establishment that serves solely alcohol, but are permitted to be in uniform in an establishment that serves food and alcohol if the pilot stays in the food-related area. (Id. at 18-20.) If a pilot is wearing only the shirt and dark pants, Swoboda does not consider the pilot to be in uniform. (Id. at 19.)
Swoboda was in a meeting with Reed and at least two other TSA flight managers after September 11 when Reed received a telephone call on his cellular telephone. (Id. at 22.) Reed left the meeting, and, when he returned, he asked the people in the room who Mohammed Hussein was. (Id. at 23-24.) Swoboda told Reed that Hussein was "ATR or a J41 OF based in St. Louis, and that he was probably a probationary employee." (Id. at 24.) Reed then instructed Swoboda to terminate Hussein's employment. (Id. at 25.) *991 Swoboda did not ask why because Hussein was a probationary employee. (Id. at 26.) After the meeting, Swoboda typed a termination letter, which he gave to Hussein the next morning. (Id. at 27-30.) Another flight manager, Captain Rodney Aman, was present and retrieved the company property, e.g., TSA identification badge and airway charts, from Hussein. (Id. at 33.) Having returned his identification badge, Hussein was escorted from TSA's Security Identification Area (an area restricted to TSA uniformed employees). (Id. at 39.) Sometime that same day, Swoboda reported to Reed that the termination was complete. (Id. at 41.)
Swoboda was never told the reason for Hussein's termination, nor did he have any idea of why it had happened.[11] (Id. at 53-54, 68.) Moreover, he has terminated other TSA employees without being advised of the reason for their termination. (Id.) He had never heard TSA employees express anger against Arabic people or people from the Middle East, nor has he heard TSA pilots express any concern about flying Arabic passengers. (Id. at 47.) He has never heard Reed make any comments after September 11 about people of the Islamic faith or from the Middle East. (Id. at 78.)
Captain Aman testified in his deposition that he met Hussein after September 11 when Hussein stopped by his office to report that the Bridgeton, Missouri, police had come to his hotel room at night to question him. (Aman Dep. at 8-9, 21-23.) Aman does not recall the subject of the questioning. (Id. at 23.) He does not know Hussein's faith, nor does he know of any TSA pilot who practices the Islamic religion. (Id. at 26-28.) Aman was at a meeting after September 11 during which Reed received a cellular telephone call about a pilot in a bar and in uniform. (Id. at 57-58.) Aman paraphrased what he heard Reed say several times"it doesn't matter"and what he heard him say once, "it doesn't matter, he was in a bar in uniform." (Id. at 58.) Reed said nothing further to the group at large about the telephone call. (Id. at 61.) Hussein was terminated in Aman's office [12] with Aman as a witness. (Id. at 70, 74.) It is TSA's policy not to inform probationary pilots of the reason for their termination. (Id. at 105.) When asked, Aman could not recall any instances of when progressive discipline had been used with a probationary pilot. (Id. at 108.) According to Aman, if a pilot went to a bar wearing only dark slacks and a white shirt with a flap epaulets could be attached to that would violate TSA's rules because that person could be identified as a pilot. (Id. at 38-39.)
Aman never heard Reed make any comments about people of the Islamic faith, people of Arabic descent, or people from the Middle East and never heard him express any security concerns about flying people of Arabic heritage or the Islamic faith. (Id. at 99, 100.) Aman has never heard any derogatory or critical comments from anyone in TSA management about Muslims or people of Arabic heritage. (Id. at 104.)
Another flight manager, Captain James White, attended the meeting after September 11 in which Reed received the telephone call. (White Dep. at 9, 12-13.) He remembers nothing else about the telephone call or about Reed's subsequent actions. (Id. 13-17.) Captain Stuart Scott was a flight operations manager for Defendant in 2001 and does not recall a September 2001 meeting with Reed during which Reed received a telephone call on his cellular telephone. (Scott Dep. at 9, 25-26.) *992 Scott had never heard of Hussein until he met Hussein for the first time when Hussein was terminated by Swoboda. (Id. at 21-22.)
Approximately one month after Hussein's termination, Reed was contacted by the FBI. (Reed Dep. at 73-74.) Reed's cellular telephone number is published in TSA's Operation Manual, and his name is known at the Howard Johnson Hotel. (Id. at 119, 126.) TSA employs another individual named Mohammed, Mohammed Wasim, who is number 15 on TSA's pilot seniority list. (Id. at 128.)
Hussein is not the only pilot to be fired by Reed on the basis of an anonymous telephone call. (Id. at 47.) In February 1999, a class of pilots and probationary pilots were in South Bend, Indiana, for training, including Captain Lionel Purnwasy. (Id. at 47; Purnwasy Dep. at 18, 22.) Reed received an anonymous telephone call that six to eight of the pilots were in a bar drinking. (Reed Dep. at 47-19.) The pilots were not identified by name. (Id. at 48.) Reed determined that there was a group of pilots in South Bend training, and, after verifying that probationary pilots were in the group, he terminated those probationary pilots "on the spot." (Id. at 47-49.) Reed did not verify the accuracy of the anonymous call in relation to the probationary pilots before terminating their employment. (Id.) He did get a statement from the bartender to verify whether nonprobationary pilots were present. (Id. at 49.) This statement also verified whether probationary pilots were present. (Id.) The pilots were fired for drinking within 12 hours of reporting for work. (Id. at 61.) According to Reed, all were terminated. According to Purnwasy, Reed terminated three and one nonprobationary captain filed a grievance. (Purnwasy Dep. at 22.) Captain Dario Miranda is unaware of any pilot ever being discharged for a violation of Part 10B(5) of the GOM.[13] (Miranda Declaration ¶ 20.)
As noted above, Hussein was hired by TSA after an application and interview process and began working on February 26,2001. (Hussein Dep. at 19-24, 26.) He knew about TSA's rule prohibiting pilots from being in a drinking establishment in uniform. (Id. at 31-33.) He understood this rule to mean that a pilot may not enter a bar in uniform if the bar serves only alcohol; however, if an establishment also serves food, a pilot may enter the establishment in uniform. (Id. at 32, 194-96, 198.) "Basically the effect of [the rule] was never be in a bar drinking in any piece of uniform." (Id. at 31.)
Hussein flew the J-41 airplane throughout his employment with TSA. (Id. at 37.) He was assigned to U.S. Airways routes and wore the U.S. Airways uniform. (Id. at 45.) He was given, and required to wear, an identification badge with his name, photograph, employee number, and the TSA logo on it. (Id. at 48-49.) During this employment period, no TSA employee made any offensive comment about Hussein's religion or race. (Id. at 41.) And, he never informed anyone in TSA management, including Reed, that he was a Muslim although the subject of his religion came up in friendly conversations with an instructor. (Id. at 102-04.) He never met Reed while employed by TSA. (Id. at 40.)
Hussein testified in his deposition that he may have walked through Skooner's bar after September 13, 2001, in uniform, but he never sat in the bar in uniform. (Id. at 90.)[14] Nor did he have any discussion *993 with anyone in the bar about the September 11 attacks. (Id. at 93.) He considers a pilot not to be "in uniform" if the pilot is not wearing his or her epaulets. (Id. at 95-97.) He has been in Skooner's bar with his pilot's shirt and pants on, but without his epaulets and his TSA identification badge. (Id. at 96.) He could not recall if he had been there dressed so after September 13. (Id. at 98-101.) From approximately September 13 to September 18, he did not drink alcohol. (Id. at 66-68, 73.) On September 13, he learned that his wife was pregnant. (Id. at 72; Ferina Ali Dep. at 35-38.)
On September 14, at approximately 9:30 a.m., FBI agents knocked on Hussein's door at the Howard Johnson St. Louis Airport Hotel, forced their way in, and began asking him questions. (Id. at 107-08.) In answer to their question about why he was smiling the night before in Skooner's while in uniform, Hussein told the agents that he may have appeared happy at the bar because he had just learned that his wife was pregnant and that he had not been in uniform. (Id. at 110-12.)
Hussein was fired on September 18. (Id. at 64; Def. Ex. G.) The termination letter reads as follows:
Dear Mohammed Hussein:
As you are aware, probationary employees serve at the discretion of the company.
After careful review, your employment with Trans States Airlines is terminated effective immediately.
Please return all identification cards and company property issued to you.
(Def.Ex. G.)
Hussein sought ALPS's assistance in contesting his termination and was referred to a union representative, Thomas Mistretta. (Hussein Dep. at 136.) Mistretta later telephoned Hussein and told him that TSA management personnel were not telling him anything about Hussein's termination. (Id. at 137.) He also told Hussein that "there is something else bigger than this" and advised him to get an attorney. (Id. at 141-43.) Hussein interpreted TSA's failure to give a reason for his termination as a reflection of a discriminatory animus based on his religion, race, or national origin. (Id. at 143.) He is not aware of any probationary pilot who was fired after successfully completing training and was given a reason for his or her termination. (Id. at 143-46.) He had heard rumors of such. (Id.) The first he learned that he was fired because of a report that he was in a bar in uniform was when he spoke with the EEOC investigator assigned to his charge of discrimination, James Gall. (Id. at 164.)
An FBI special agent, Henry J. Vera, Jr., prepared a report about his investigation of Hussein. (Pl.Ex. 35.) According to this report, Emmett Conrecode contacted the St. Louis Airport Police on September 14 at 2:12 a.m. and reported that he had seen an individual of Middle Eastern descent wearing a pilot "T-shirt" and perhaps a TSA pilot's identification and making statements in support of the September 11 attacks in a Howard Johnson Hotel bar. (Id.) According to the report of the interview with Hussein, Hussein told the agent that he was in Skooner's bar the evening of September 13 sitting at the bar, drinking an alcoholic beverage, and eating his dinner. (Id.) He denied making any comments in favor of the September 11 attacks and explained that he was excited about the recent news that his wife was pregnant with their first child. (Id.) Hussein also told the agent that he "was not wearing any insignias that would indicate that he was a pilot," but "acknowledge^] that his epauletted white shirt and blue pants were indicative of a member of a flight crew." (Id.) In reply to an e-mailed question by defense counsel about the type *994 of shirt Hussein was wearing the night in question, the agent stated that Hussein had said that he "was wearing an epauletted white shirt and blue pants while drinking alcoholic beverages and eating dinner in Skooner's bar." (Def. Ex. A to Def. Response to Pl. Surreply.)
As noted above, before working for TSA, Hussein worked for SkyWest as a customer service supervisor. (Hussein Dep. at 244.) One day, he signed in for a coemployee who told him that he had forgotten to do so. (Id. at 245.) Another supervisor, however, had seen that employee come in late. (Id. at 245-46.) Hussein testified that he learned that he was going to be suspended for falsifying a timecard and told SkyWest he would quit first. (Id. at 246-17.) He further testified that he did indeed quit before he received a letter but could not recall whether it was a termination letter, although he believed it was. (Id. at 246, 258.) He also explained in an interrogatory answer that he left the SkyWest job due to a conflict of interest. (Id. at 244-45.)
SkyWest issued Hussein a counseling statement on October 12, 1999, for initialing a fellow supervisor's timecard indicating that the supervisor was on time for his shift. (Def.Ex. SW2.) According to Sky-West, this was a breach of honesty and integrity. (Id.) The counseling statement indicated that Hussein was to be suspended for three days beginning October 14 and placed on probation as a supervisor for 90 days beginning October 17. (Id.) The day before the suspension was to begin, Hussein was fired for allegedly removing a customer's lost and found item without permission. (Def.Ex. SW1.) Notations on the termination letter read "Not eligible for rehire" and "Agent Refused to Sign." (Id.)
Also as noted above, James Gall, an investigator for the EEOC, was assigned Hussein's case after Hussein completed a charge questionnaire. (Gall Dep. at 13-14, 23; Def. Ex. HH.) Gall understood from speaking with Hussein and from reviewing the charge that Hussein believed that he was discriminated against on the basis of his race or religion. (Gall Dep. at 26.) Gall learned that it was TSA's position that probationary pilots were not entitled to file grievances or to the arbitration process and that it was not necessary to provide a probationary pilot with a reason for his or her termination. (Id. 37-39, 41-42.) TSA advised Gall that Hussein had been terminated because TSA received a report that he had been in a drinking establishment when in uniform. (Id. at 43.) Hussein denied this allegation. (Id. at 45, 48.) TSA further advised Gall that they were unable to identify the source of the telephone call to Reed. (Id. at 52.) Reed advised Gall that he had ordered his flight manager to investigate, and after that, he received a call from the FBI informing him that they were questioning Hussein. (Id. at 55.) The combination of the anonymous telephone call and the information from the FBI caused Reed to terminate Hussein. (Id. at 57-58.) Gall did not receive any information that Reed was motivated by Hussein's religion or that suggested that TSA did not receive a report that Hussein had been drinking in a bar. (Id. at 44, 58-59.)
Following his investigation, Gall conducted a determination interview with Captain Hayes and advised him that the evidence showed Hussein was terminated on September 18, 2001, as a result of a report from an anonymous source whose allegations were not investigated or substantiated. (Id. at 62, 64; Def. Ex. NN.) Gall explained his rationale for finding discrimination as "the timing of all this." (Gall Dep. at 100-01.) There were no direct statements by Reed that the termination was based upon Hussein's national origin, religion, or race. (Id.)
*995 Subsequently, Gall prepared a notice of determination advising TSA of EEOC's charge and conciliation process. (Id. at 95-96; Def. Ex. U.) A conciliation agreement was forwarded to TSA by the EEOC seeking back-pay of $27,000, compensatory damages of $5,500, punitive damages of $150,000, and reinstatement with full retroactive security training and a cleared personnel file. (Def.Ex. CCC.) By letter of June 4 addressed to Gall, Captain Hayes rejected this agreement and made a counteroffer for reinstatement with seniority intact, assignment to a base and aircraft of TSA's choice, and a requirement that Hussein complete his probationary term as outlined in the CBA. (Def.Ex. BB.) A follow-up letter from Hayes to Gall on June 13 advised Gall that no back-pay was offered to Hussein for the period from September 11, 2001, to Spring 2003, but only for the Spring of 2003 to the date of the letter, explaining that approximately 200 pilots had been furloughed during that period. (Def.Ex. DD.) Hayes further advised Gall that he was reluctant to take the time to calculate the backpay "as we have been so far apart" between the demand and the offer, and "that would be our highest possible offer." (Id.) This letter was in response to Gall's letter to Hayes dated June 11, 2003, requesting a response to the counteroffer. (Def.Ex. CC.) On June 16, Gall wrote Hayes and requested that the amount of back-pay be calculated "so that conciliation efforts can move forward" and also requested specifics on the guarantees that Hussein would receive about necessary training and being allowed to continue training until he successfully completed it. (Def.Ex. EE.) Gall requested a response by June 20, 2003, in order to continue the conciliation process. (Id.) By letter of June 18, however, Gall advised Hayes that the conciliation process had been considered unsuccessful and ended the process. (Def.Ex. FF.) Gall came to this conclusion after discussing TSA's June 13 offer with Hussein. (Gall Dep. at 88-89.) Hussein was firm on his demand, which included a monetary amount and reinstatement conditions[15] which were quite different than what TSA had offered. (Id. at 89; Hussein Dep. at 165, 167, 169-70; Hussein Aff. at 8-17.) Consequently, Gall recommended that conciliation efforts stop. (Id. at 76-77.)
TSA moves for summary judgment on Hussein's claim that he was discharged in violation of Title VII and for an award of attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and 28 U.S.C. § 1927. TSA also requests that the action be dismissed and attorney's fees be awarded on the grounds that the EEOC failed in its duty to conciliate. In the alternative, TSA argues that any relief obtained by Hussein should be limited to the period before February 9, 2004, because TSA would have discharged him on that date for not disclosing the true reason why he left Sky-West. Both the EEOC and Hussein vigorously oppose the motion.

Discussion
Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of *996 the suit under the governing law." Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir.1992) (citations omitted).
The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See City ofMt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir.1988). After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the non-moving party bears the burden of setting forth specific facts by affidavit or otherwise showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 565-66 (8th Cir.2000). All disputed facts are to be resolved, and all inferences are to be drawn in favor of the non-moving party. See Ghane v. West, 148 F.3d 979, 981 (8th Cir.1998); Kopp v. Samaritan Health Sys., Inc., 13 F.3d 264, 269 (8th Cir.1993). "[I]n order to defeat a motion for summary judgment, the nonmovant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Webb v. Lawrence County, 144 F.3d 1131, 1135 (8th Cir.1998) (alteration added). "Mere allegations not supported with specific facts are insufficient to establish a material issue of fact[.]" Henthorn v. Capitol Communications, Inc., 359 F.3d 1021, 1026 (8th Cir.2004) (alteration added). "Only admissible evidence may be used . . ., and affidavits must be based on personal knowledge." Id. (alteration added) (interim citations omitted). See also Stanback v. Best Diversified Products, Inc., 180 F.3d 903, 909 (8th Cir.1999) (finding general statements in affidavits and depositions are insufficient to defeat a properly supported summary judgment motion).
Summary judgment should seldom be granted, however, in cases alleging employment discrimination. See Bradley v. Widnall, 232 F.3d 626, 630-31 (8th Cir. 2000); Keathley v. Ameritech Corp., 187 F.3d 915, 919 (8th Cir.1999); Hardin v. Hussmann Corp., 45 F.3d 262, 264 (8th Cir.1995). This is so "[b]ecause employment discrimination cases frequently turn on inferences rather than direct evidence," Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir.1999) (alteration added), and are inherently fact based, Keathley, 187 F.3d at 919.
There is no direct evidence of discrimination; consequently, the EEOC and Hussein's claims of discrimination must be viewed under the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir.2004); Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1046 (8th Cir.2003). In order to establish a prima facie case of race, religion, or national origin discrimination based upon circumstantial rather than direct evidence, they must show "(1) [Hussein] is a member of a protected class; (2)[he] was qualified for [his] position and performed [his] duties adequately; and (3)[he] suffered an adverse employment action under circumstances that would permit the court to infer that unlawful discrimination had been at work." Habib v. NationsBank, 279 F.3d 563, 566 (8th Cir. 2001) (citing Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir.2000)) (alterations added). If a prima facie case is established, the employer must then offer legitimate reasons for the adverse action. Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). The employer's *997 burden "is one of production, not persuasion." Cherry v. Ritenour School Dist, 361 F.3d 474, 478 (8th Cir.2004). "If the employer meets this burden of production, the presumption raised by the prima facie case disappears, and the burden shifts back to the plaintiff to show that the articulated reason was a pretext for discrimination." Tolen v. Ashcroft, 377 F.3d 879, 882 (8th Cir.2004).
Hussein is a member of a protected class and he suffered an adverse employment action. TSA argues that he was fired because of a report that he had violated a company rule, i.e., he was in a bar in uniform. As is often the case, "`[TSA's] proffered reason [for discharging Hussein] is that [Hussein] was not performing the job satisfactorily, which is simply the negative of one of the elements of the prima facie case.'" Cherry, 361 F.3d at 479 (quoting Erickson v. Farmland Indus., Inc., 271 F.3d 718, 726 (8th Cir.2001)) (alterations added). "[T]he presumptive case requires only a minimal showing[, however,] while a showing of pretext requires more substantial evidence." Id. (alterations added). Moreover, "[although it is possible for strong evidence of a prima facie case to also present a factual issue on pretext, the ultimate question is whether the plaintiff presents evidence of conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision to fire [the plaintiff]." Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir.1999) (citations and quotations omitted) (first alteration added, others in original). For purposes of the instant motion, the Court will assume that a prima facie case of discrimination based on race, religion, and national origin has been established.
The evidence is uncontroverted that Captain Reed received a telephone call from a man identifying himself as a pilot and reporting that a TSA pilot was in a bar on September 13, 2001, in uniform (epaulets and, perhaps, a TSA identification badge). There is conflicting evidence whether Hussein was actually in the bar or was in the restaurant portion of the establishment and whether Reed was also told that the TSA pilot was of Middle Eastern descent and had been making comments supportive of the terrorist attacks two days before. The caller, Captain Conrecode, did tell the FBI that Hussein appeared to be of Middle Eastern descent and was making supportive comments. On the other hand, Hussein denies that he was in uniform, was drinking alcohol in the bar, or was talking about September 11.
"The question is whether [TSA's] denials and justifications were a pretext for [discrimination], not whether [Hussein] actually did what he was accused of doing or whether discharge was warranted." Grey v. City of Oak Grove, 396 F.3d 1031, 1035 (8th Cir.2005) (alterations added). See also Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir.1999) (finding that discharged employee's denial that she violated company's rules against eating food without paying for it was not, standing alone, evidence that employer fabricated the charge).
In the instant case, neither the EEOC nor Hussein have introduced any evidence that Reed was not told during a telephone call that Hussein had been in uniform in a bar on September 13. It is undisputed that being in a bar and in uniform is a violation of TSA's rules, specifically, § 10B of the GOM (providing that uniformed crew members are prohibited from visiting any establishment or portion thereof where the primary purpose is to serve alcoholic beverages). Hussein denies being *998 either in uniform or in a bar that evening. This denial is not, however, evidence that TSA fabricated the telephone call.
The EEOC and Hussein argue that there is evidence of pretext, for instance, TSA's failure to follow its own progressive discipline policy. Although "[a]n employer's failure to follow its own policies may support an inference of pretext," Floyd v. Missouri Dep't of Social Servs., 188 F.3d 932, 937 (8th Cir.1999) (alteration added), there is no genuine issue of material fact as to whether TSA failed to follow its policies.
TSA's progressive discipline policy is outlined in the employee handbook. This handbook provides that, except for serious violations, an employee is to be first given a verbal warning for an infraction and that "progressive discipline" will be utilized to discipline employees. (Pl.Ex. 2 at 14.) If, however, there is a conflict between the employee handbook and the GOM, the GOM controls. If there is a conflict between the handbook and the CBA, the CBA controls. The CBA provides that a pilot (a) shall not be disciplined or discharged without cause, (b) will normally be notified when an investigation determines that discipline may be warranted and of the reasons for the discipline, (c) will be given an opportunity to explain his or her position in defense of the job action, and (d) may appeal a disciplinary action. (PL Ex. 1 §§ B(1)(a), B(1)(b), and B(2).) The CBA further explicitly provides that nothing contained in the discipline and discharge section of the agreement shall be construed as extending to a probationary pilot. (Id. § B(5).) Thus, Section B(5) of the CBA specifically negates any progressive discipline procedure for probationary pilots. Insofar as this provision conflicts with the employee's handbook's progressive discipline policy, the CBA clearly controls. The evidence before the Court is that Hussein was fired following a report to Reed that he had been in a bar in uniform and that the progressive discipline policy did not apply to him because he was a probationary pilot.
"`[P]robably the most commonly employed method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race, [religion, or national original] received more favorable treatment.'" Cherry, 361 F.3d at 479 (quoting Erickson, 271 F.3d at 726-27) (alterations added). Rather than evidence of more favorable treatment given to similarly situated people, i.e., probationary pilots, there is evidence that Hussein was treated the same. Probationary and non-probationary TSA pilots attended a training program in South Bend, Indiana, in 1999. Reed received an anonymous report that some of these pilots were drinking alcohol 12 hours prior to reporting to work, in violation of the GOM. Those that were probationary pilots were discharged "on the spot" without verification of the accuracy of the anonymous report. The non-probationary pilots were discharged after a substantiating statement was taken from the bartender.
The EEOC and Hussein further argue that a discriminatory animus based on his race, religion, and national origin may be inferred from the timing of his discharge in relation to the September 11 terrorist attacks. This inference is supported, they argue, by Reed's decision to discharge him based on an anonymous report and without an investigation that went further than learning that Hussein was in St. Louis and was a probationary pilot.
While in a meeting following the September 11 terrorist attacks, Reed received a telephone call from a man identifying himself as a TWA pilot and telling Reed that he had seen Hussein in a bar and in *999 uniform.[16] Other than requesting information from his subordinates about the status of Hussein after this telephone call, the only comments credited to Reed are those heard by Captain Aman. Aman testified that Reed stated several times words to the effect of "It doesn't matter" and once stated, "It doesn't matter, he was in a bar in uniform." Assuming, without deciding, that Captain Conrecode also informed Reed, as he had informed the FBI, that Hussein appeared to be of Middle Eastern descent and spoke in favor of the terrorist attacks, there is no evidence that this influenced Reed in his decision to terminate Hussein for a violation of TSA rules. Hussein testified that at no time during his employment with TSA did anyone in management or otherwise make any negative comment about his race, religion, or national origin. Indeed, there is no evidence of any negative comments about, or actions taken in relation to, Hussein's race, religion, or national origin. Nor is there any evidence that anyone in TSA's management or employ spoke against, or took any action, after the September 11 attacks in relation to people of Middle Eastern descent. There is evidence, however, that the decision-maker, Captain Reed, was unaware of Hussein's race, religion, or national origin. There is no evidence that Reed presumed that Hussein was of the Islamic faith because of his name. And, as found above, TSA did follow its own rules in firing Hussein without an investigation or notification of the reasons for his discharge.
TSA has articulated a nondiscriminatory, legitimate reason for Hussein's dischargea violation of company rules by a probationary pilot. The EEOC and Hussein then have the burden of demonstrating that this reason is pretextual. To carry this burden, they must come forth with evidence that "could lead a reasonable jury to believe that his termination was not really due to the violations of company policy, [as TSA] asserts, but was instead due to racial[, religious, or national origin] animus." Williams v. St. Luke's-Shawnee Mission Health Sys., Inc., 276 F.3d 1057, 1059 (8th Cir.2002) (alterations added). See also Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir.2002) (holding to same effect). The evidence that the EEOC and Hussein have produced is Hussein's name, race, religion, and national origin and the date he was firedtwo days after the terrorist attacks on September 11. They have introduced no statements or actions by persons involved in TSA's decision-making process reflective of a discriminatory attitude.
To conclude that the EEOC and Hussein have presented a triable issue as to pretext in response to the properly-supported pending motion, the Court would have to find that the timing of his discharge gives rise to an inference that someone of Hussein's name and appearance was discriminated against in reaction to the tragic events of September 11. This the Court cannot do under the standards set forth above. See Sprenger, 253 F.3d at 1114 (noting that the court "ha[s] been hesitant to find pretext or discrimination on temporal proximity alone, and look[s] for proximity in connection with other evidence") (alterations added; interim citations omitted). See also Girten v. McRentals, *1000 Inc., 337 F.3d 979, 982 (8th Cir.2003) (affirming summary judgment entered pursuant to motion that was opposed on theory supported only by contentions and speculation rather than by evidence); Helfter v. United Parcel Service, 115 F.3d 613, 616 (8th Cir.1997) (noting that general, conclusory statements in affidavits and deposition testimony are insufficient, standing alone, to withstand a properlysupported motion for summary judgment).
The Court does find, for the reasons set forth above, that the EEOC and Hussein have failed to present sufficient evidence to raise a question of material fact as to whether TSA's explanation that Hussein was fired because Reed received a report that he, a probationary pilot, was in a bar in uniform was pretextual and to create a reasonable inference of discrimination based on his race, religion, or national origin.[17]
In addition to seeking summary judgment on the merits of the EEOC and Hussein's discrimination claims, TSA seeks an award of attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k) and 28 U.S.C. § 1927.
Section 2000e-5(k) permits an award of attorney's fees as part of the costs to a prevailing party in a Title VII action. The EEOC is liable under this section "the same as a private person." 42 U.S.C. § 2000e-5(k). "[U]nder Christiansburg [Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978)], courts may award attorneys' fees to prevailing Title VII plaintiffs except under special circumstances, but may not award attorneys' fees to prevailing Title VII defendants except in narrow circumstances." Marquart v. Lodge 837, In'l Ass'n of Machinists, 26 F.3d 842, 849 (8th Cir.1994) (alterations added). "[A]t the very least, a prevailing defendant must prove that a plaintiffs case is frivolous, unreasonable, or groundless," id. at 852, or that the plaintiff "continued to litigate after it clearly became so," Christiansburg, 434 U.S. at 422, 98 S.Ct. 694. Contrary to the case cited by the EEOC, O'Hara v. Board of Education, 590 F.Supp. 696 (D.N.J. 1984), a defendant may be able to prove this in a motion for summary judgment. Marquart, 26 F.3d at 849. `"[A] court may not[, however,] award attorneys' fees solely because the plaintiff did not prevail.'" Id. at 849 (alterations added). Moreover, in deciding whether to award a prevailing defendant attorney's fees, the court is to follow the Supreme Court's admonition in Christiansburg "to refrain from post hoc reasoning and to view the reasonableness of the matter from the plaintiffs perspective at the time." Flowers v. Jefferson Hospital Ass'n, 49 F.3d 391, 392-93 (8th Cir.1995).
Guided by this standard, the Court finds an award of attorney's fees to TSA be inappropriate. Although the claims of discrimination are found to be without merit, they are not frivolous or groundless. Nor can the Court conclude that an award of fees is appropriate under § 1927.[18]
TSA further argues that it should be awarded its attorney's fees on the grounds that the EEOC failed in its duty to conciliate.
*1001 Conciliation is "an integral part of Title VII." Johnson v. Nekoosa-Edwards Paper Co., 558 F.2d 841, 847 (8th Cir.1977). The purpose of conciliation is to provide defendant notice of a claim, provide an opportunity to respond to the claim, and avoid expensive time-consuming court actions. Id. Additionally, the EEOC must conciliate in good faith, id. at 848, in an "`attempt to achieve a negotiated settlement' of charges brought under Title VII," EEOC v. Michael Constr. Co., 706 F.2d 244, 251 (8th Cir.1983) (quoting EEOC v. Associated Dry Goods Corp., 449 U.S. 590, 595 n. 5, 101 S.Ct. 817, 66 L.Ed.2d 762 (1981)).
The record clearly shows that both the EEOC and TSA attempted to resolve this dispute through conciliation rather than litigation. After an investigation, which included input from TSA employees and Hussein, a conciliation agreement with a settlement "demand" was drafted and forwarded to TSA. (Def.Ex. CCC.) TSA replied with a counteroffer, and later expanded that counteroffer with more detail. (Def. Ex. BB; Def. Ex. DD.) At this point, Captain Hayes advised Gall that he was reluctant to take the time to provide further calculations because the parties were so far apart in their respective positions. Nonetheless, Gall requested the calculations be performed. This lawsuit was filed prior to the time period specified by Gall for Hayes to respond. Gall testified that he considered the conciliation efforts to be over because Hussein and TSA were so far apart in their respective positions. Thus, the parties agree on thisthat they were far apart. There is no indication that the EEOC could have convinced Hussein to come down in his settlement demand, or that TSA would have come up. Timing, cited by Gall as a basis for his finding of a discriminatory animus, also appears to be the basis for TSA's argument that the EEOC failed to in its conciliation duties. Assuming, without deciding, that this might otherwise be a basis for dismissing a lawsuit,[19] under the facts of this case, it is not a basis for an award of attorney's fees.

Conclusion
For the reasons set forth, summary judgment will be entered in favor of TSA on the merits of the EEOC and Hussein's claims of a discriminatory discharge in violation of Title VII. TSA's requests for attorney's fees and costs is denied. TSA's argument that any award of backpay should be limited to the period prior to February 2004 is moot.
Accordingly,
IT IS HEREBY ORDERED that the motion for summary judgment of Trans States Airlines is GRANTED in part and DENIED in part as set forth above. [Doc. 85]
An appropriate Judgment shall accompany this Memorandum and Order.

JUDGMENT
In accordance with the Memorandum and Order filed this date and incorporated herein,
IT IS HEREBY ORDERED, ADJUDGED, and DECREED that this cause of action is DISMISSED with prejudice.
NOTES
[1] The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).
[2] This action was filed by the EEOC. Hussein subsequently intervened.
[3] The stipulations cited are those factual allegations in TSA's or the EEOC's statement of uncontroverted facts that are not in dispute.
[4] The Airline Pilots Association, International, AFL-CIO, was added as a defendant pursuant to Fed.R.Civ.P. 19.
[5] Dario M. Miranda is the Chairman of the ALPA for TSA pilots. (Miranda Aff. ¶ 1.)
[6] The title "Captain" is used for pilots who command an aircraft when they fly. (White Dep. at 9.)
[7] According to Conrecode, a pilot's shirt has bars with buttons to secure the epaulets and premade holes over the left breast pocket to attach the pilot's wings. (Id. at 18.)
[8] There is another bar at the Howard Johnson St. Louis Airport Hotel, Kung Jeon, where Conrecode saw Hussein later that evening with the epaulets removed from his clothing. (Conrecode Dep. at 45-48.) Angelina Lodatto, a bartender at Kung Jeon, avers that Hussein was in the bar on September 13, but was not wearing a pilot's uniform. (Lodatto Aff. ¶ 13.)
[9] In 2004, Reed asked a flight manager present at the meeting, Captain Rodney Aman, if he remembered the name of the individual who called at the 2001 meeting. (Aman Dep. at 63-64.)
[10] Interestingly, the EEOC investigator, James Gall, also could not determine Hussein's religion based solely on his name. (Gall Dep. at 34.) Although he never met Hussein, he would describe him after seeing his picture as "middle eastern looking." (Id. at 62.)
[11] Swoboda had heard rumors, however, that Hussein had been in uniform in an area where drinks were served. (Id. at 69.)
[12] Several flight managers, including Swoboda and Aman, share an office.
[13] Captain Miranda is the Chairman of the ALPA for TSA pilots. (Miranda Aff. ¶ 1.)
[14] For purposes of the pending motion, TSA accepts as true Hussein's testimony that he was not in uniform at Skooner's bar on the date in question. (Def. Stip. ¶ 29 n. 4.)
[15] Hussein wanted back pay from September 18, 2001, payment of expenses he incurred because he was without wages for some time, e.g., late fees, and not to be on a probationary status.
[16] There is a conflict in the record about what being "in uniform" means and whether Hussein was, in fact, "in uniform" the evening of September 13. Regardless, there is no dispute that Reed was told he was in uniform. "[R]eliance on an honest yet incorrect belief is not evidence of pretext." Sprenger v. Federal Home Loan Bank of Des Moines, 253 F.3d 1106, 1112 (8th Cir.2001) (alteration added). Moreover, any ambiguity about what being "in uniform" requires does not, in and of itself, support an inference of discrimination. See Taylor v. White, 321 F.3d 710, 717 (8th Cir.2003).
[17] Both TSA and the EEOC argued facts in the footnotes in their respective memorandum. This is not an appropriate practice.
[18] Title 28 U.S.C. § 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney fees incurred because of such conduct.
[19] But see Sedlacek v. Hack, 752 F.2d 333, 335 (8th Cir. 1985) (noting that a failure by the EEOC to attempt conciliation "cannot affect a complainant's substantive rights under Title VII").